**John T. CORRIGAN, as legal guardian for daughter Maura L. Corrigan, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 84–787–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 20, 1985.

John L. McGann, Arlington, Va., for plaintiff.

Paula M. Potoczak, Asst. U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

### I. INTRODUCTION

This action is brought by the guardian of an individual who is physically and mentally incapacitated as a result of an alcohol related automobile crash in Fairfax County, Virginia. The accident was caused by the reckless driving of a highly intoxicated off-duty serviceman, Patrick M. Patterson, who subsequently pled guilty to a manslaughter charge and was sentenced to a year in prison.

Plaintiff filed the instant action under the Federal Tort Claims Act against the United States in federal district court in Ohio, alleging that the United States was negligent in serving Patterson alcoholic beverages at various military facilities on the eve of the accident when the government knew or should have known that Patterson was underage and intoxicated. The government's actions, plaintiff claims, violated both Virginia law and applicable military regulations. The Corrigan action was transferred to this court for consolidation with 84–675–A, a wrongful death action brought against the United States arising out of the same automobile crash.[1]

On October 18, 1984, this Court denied the government's motion to dismiss plaintiff's claim, holding that, under Virginia law, tavern owners have an obligation to refrain from selling alcohol to intoxicated or underage patrons. *Corrigan v. United States*, 595 F.Supp. 1047 (E.D.Va.1984). In the course of discovery, plaintiff was granted leave to amend the complaint to allege further negligence by the government in failing to identify and treat Patterson's alcohol problem prior to the accident.

### II. FINDINGS OF FACT: LIABILITY

This matter comes before the Court on a trial to the bench on March 18, 1985. Pursuant to Rule 52(a), the Court makes the following findings of fact.

1. Patrick M. Patterson enlisted in the Army on June 19, 1980. After completing basic training, Patterson was sent to the Defense Language Institute (DLI) in Monterey, California, for training in the Korean language. (Testimony of Patterson)

2. Patterson had his first experiences with alcohol while at the DLI. At first, Patterson would consume alcohol only on weekends. However, Patterson gradually started spending more and more time at the nearby Army NCO Club, which was open until 10 p.m. on weeknights and until 2 a.m. on weekends. By the end of 1980, Patterson was a regular at the NCO Club, arriving in the late afternoon or early evening and consuming large quantities of alcohol until the Club closed. At first, Patterson would drink about one 60 ounce pitcher of beer a night. Later, though, his drinking increased to three or four pitchers a night. (Testimony of Patrick Patterson)

3. When he drank at the Club, Patterson would become more relaxed, less inhibited, and a little rowdy. On one occasion, Patterson got angry with another Club patron, left the Club, and had a fight with that patron outside; Patterson was banned from the Club for ten days for this incident. On another occasion, Patterson left the Club in an intoxicated state, climbed a tree, and subsequently fell to the ground and injured himself. (Testimony of Patrick Patterson).

4. While Patterson's academic performance was satisfactory during his first few months at DLI, it began to decline in the spring of 1981. This decline was due in part to Patterson's drinking and "personal problems," and in part to his poor academic attitude and his waning interest in learning the Korean language. (Testimony of Patrick Patterson)

5. In March 1981, Patterson bought his first car, a 1973 Torino. On May 19, 1981, the military police observed Patterson driving his vehicle in a reckless manner. Although the officers chased Patterson, Patterson managed to evade them. Within minutes, however, Patterson drove off of

---

**1.** Civil Action No. 84–675–A, *Dimos v. United States*, was settled by the parties out of court.

the road, hit a tree, and was knocked unconscious; his car was destroyed. Patterson was taken to the emergency room at the Fort Ord base hospital, where his blood alcohol level was measured at .24. (Testimony of Patrick Patterson, plaintiff's exhibits 14 and 49)

6. On June 16, 1981, Patterson pled guilty to a reckless driving charge for the events of May 19, 1981. (Testimony of Patrick Patterson, plaintiff's exhibit 49)

7. Concerned about the deleterious effect that alcohol and drug abuse has upon service members, especially younger service personnel who have little or no experience with alcohol, Congress directed the armed services to establish alcohol rehabilitation programs. Pursuant to directives from Congress, the Army has commendably designed and established, through regulation AR 600–85, an Alcohol and Drug Abuse Prevention and Control Program (ADAPCP). These regulations were in effect throughout Patterson's tenure at DLI, and at the time of the fatal accident in December 1981. (Plaintiff's exhibit 2)

8. The stated objectives of the ADAPCP program, according to both the plaintiff's and defendant's evidence, were to prevent alcohol and drug abuse in the Army, identify abusers as early as possible, and to restore such abusers as effectively functioning members of the Army. In short, these regulations were developed only to benefit the individual service member and the Army, not the general public. (Plaintiff's exhibit 2, testimony of Dr. Wise)

9. The Army claimed a 70–75% success rate for those service personnel who entered the ADAPCP program. However, the Army claimed that its treatment was "successful" if it returned the affected person to his or her normal duties, and that person performed satisfactory work for 90 days. The program was actually far less successful in achieving long-term abstinence among alcohol abusers; the long-term success rate was especially low among young, enlisted personnel such as

Patterson. (Testimony of Lt. Col. Kruzcich)

10. Army regulations indicate that Patterson's alcohol-related crash on May 19 should have been reported to Patterson's commanding officer, and to the installation's Drug and Alcohol Center. These reports would have assured Patterson's referral to the ADAPCP for evaluation and education. (AR 190–5, AR 600–85, plaintiff's exhibit 2)

11. However, due either to procedural flaws which existed in the reporting process or to clerical error, Army records indicate that Patterson's crash was never reported to his commanding officer as required by Army regulations. Furthermore, Patterson was never referred to the ADAPCP program as required by Army regulations. (Plaintiff's exhibits 12 and 24, testimony of Patrick Patterson and Lt. Col. Allen)

12. Despite his heavy drinking and his obvious problems associated with that drinking, Patterson refused to admit that he had a problem with alcohol. (Testimony of Patrick Patterson)

13. On May 21, 1981, DLI initiated proceedings to dismiss Patterson from the school for "inadequate efforts," and Patterson was officially dismissed from DLI on June 2, 1981. On June 12, 1981, Patterson received orders reassigning him to Fort Jackson, South Carolina. (Plaintiff's exhibits 33 and 56)

14. After serving approximately two months at Fort Jackson, Patterson was reassigned to Fort Myer, Virginia, where he reported on August 30, 1981. While at Fort Myer, Patterson worked from 9 a.m. to 5 p.m. at the Pentagon in the Ballistic Missile Defense Office, and he lived in the barracks at Fort Myer. (Plaintiff's exhibit 51, testimony of Patrick Patterson)

15. While at Fort Myer, Patterson became a regular at an Army Snack Bar which was located next to his barracks. Patterson would routinely go to the Snack Bar five to seven nights a week and stay until it closed at 10 p.m., drinking an aver-

age of three to four 60 ounce pitchers of beer a night. Even though Patterson was clearly accustomed to drinking large quantities of beer, he had little or no experience with drinking hard liquor. (Testimony of Patrick Patterson and George Devaney)

16. On weekends, Patterson would frequently drink and socialize at the NCO Club at Arlington Hall, a base located two or three miles from Fort Myer. On these occasions, Patterson would usually get very drunk. (Testimony of Patrick Patterson)

17. While at Fort Myer, Patterson did all of his drinking on military establishments because drinks were significantly cheaper there, and because military clubs did not have a "cover charge." (Testimony of Patrick Patterson)

18. In late October of 1981, Patterson purchased another car, a 1965 Ford Mustang. Patterson would occasionally use the car to drive to Arlington Hall on weekends; on other occasions Patterson would take a cab to Arlington Hall with other servicemen. (Testimony of Patrick Patterson)

19. On the afternoon of December 19, 1981, Patterson went to the Snack Bar at Fort Myer and drank several beers. After leaving the Snack Bar, Patterson ran into John Crouch, a fellow serviceman, and asked Crouch if he wanted to go to Arlington Hall and "get blitzed." Crouch declined the invitation. (Testimony of John Crouch)

20. Late that afternoon, Patterson met Jeffrey Charles, a serviceman who had recently been assigned to Fort Myer. Patterson informed Charles that he was going to the Arlington Hall NCO Club that evening, and Charles persuaded Patterson to give him a ride there that evening. Patterson then left and went back to his room. (Testimony of Jeffrey Charles)

21. At around 8 p.m. on the evening of December 19, Patterson and Charles met and went together to the Snack Bar at Fort Myer. While at the Snack Bar, Patterson consumed about three beers. Patterson

and Charles left the Snack Bar at 10 p.m., and the two left for Arlington Hall in Patterson's car. (Testimony of Jeffrey Charles)

22. Service personnel from the entire Washington, D.C. area frequent the Arlington Hall NCO Club. While some service persons simple walk to the club from their barracks, many others drive to the club. The bartenders at the Arlington Hall NCO Club have no way of knowing whether a customer is from Arlington Hall or from another base. (Testimony of Dorothy Brown)

23. Patterson and Charles arrived at the Arlington Hall NCO Club around 10:15 p.m. They showed their military identification cards at the door and were admitted. It was the clear policy of the NCO Club to admit any person with military identification who was 18 years of age or older. The club did not check identification cards inside of the club when patrons ordered drinks. (Testimony of Jeffrey Charles, Dorothy Brown, and Matthew Smith)

24. At that time, the NCO Club did not hire waitresses to serve drinks to patrons. All drinks were dispensed from the bar area by bartenders. On the night of December 19, 1981, there were two bartenders on duty. The bar area was very crowded that night, as it was every Saturday night, and it was the customary practice for the bartenders to serve a number of drinks to one customer, who would then take the drinks back to a table where they would be consumed by other patrons. There were many patrons standing around the bar area all evening. A number of other customers were seated at one of the many tables in the bar, or were dancing on the dance floor. (Testimony of Jeffrey Charles, Dorothy Brown and Matthew Smith)

25. Drinks at Arlington Hall were very inexpensive. For example, most mixed drinks were only $1.05 each, and beers were ·75¢ each. (Testimony of Matthew Smith)

26. Upon their arrival, Patterson convinced Charles to buy him a drink, a double

peppermint schnapps and Coke[2], to "pay him back" for the ride. The bartender at the Club served Patterson the drink, even though Patterson was only 19 years old at the time. (Testimony of Jeffrey Charles)

27. After buying Patterson a drink, Charles left Patterson and began to wander around the bar in search of companionship. Patterson began drinking with a small group seated at a table adjacent to the bar. Patterson spent the next two hours either drinking and talking with this group, or drinking alone at the bar. Patterson never strayed far from the bar area. (Testimony of Jeffrey Charles and Dorothy Brown)

28. After Patterson finished his peppermint schnapps and Coke, he drank Jack Daniels bourbon and Coke continuously until about 12 midnight. The bartender at the Club served Patterson Jack Daniels even though Patterson was only 19 years old at the time. (Testimony of Dorothy Brown and Jeffrey Charles)

29. Shortly after midnight, Patterson left the club alone, hopped into his car, and began to drive recklessly down the road. At around 12:15 a.m., approximately five miles from Arlington Hall, Patterson rammed his car into the car immediately in front of him on the road. Attempting to leave the scene of that accident, Patterson quickly put his car into reverse, slammed into the car behind him which was driven by John Wolfrey, and sped off. Mr. Wolfrey gave chase. (Testimony of John Wolfrey)

30. In his efforts to avoid Wolfrey, Patterson turned off his headlights and began to drive very erratically, running stop signs and driving at speeds in excess of 60 miles per hour. (Testimony of John Wolfrey, plaintiff's exhibit 76)

31. At approximately 12:40 a.m., Patterson ran a stop sign at the intersection of Greenway Blvd. and S. Washington St. and struck an automobile driven by Michael McDonnell. Mr. McDonnell was killed, and a passenger in the McDonnell's car, Maura Corrigan, was knocked unconscious. At the present time, Maura Corrigan is still in a coma-like state as a result of the collision. (Plaintiff's exhibits 66–69)

32. Patrick Patterson was also knocked unconscious by the accident, but he regained consciousness the following afternoon. Shortly after his admission into the hospital, Patterson's blood alcohol level was measured at .26%. Even today, Patterson has almost no recollection of what happened that evening. (Testimony of Patrick Patterson, plaintiff's exhibits 70 and 74)

33. No intoxicants were found in Patterson's car. Based upon testimony regarding Patterson's normal drinking habits, his activities that evening, and the location of the various accidents in relationship to the club, there is no doubt that Patterson did all of his drinking that evening at either the Fort Myer Snack Bar or the Arlington Hall NCO Club.

34. Immediately after the accident, Officer Charles Sherin of the Fairfax County Police Department was assigned to investigate the accident. In the course of his investigation, and within several days after the accident, Sherin interviewed Dorothy Brown, a bartender at the Arlington Hall NCO Club who was on duty the night of the accident. After being shown a photograph of Patterson, Brown recalled seeing him at the Club and serving him mixed drinks on the evening of December 19th. Brown stated that Patterson was drinking heavily, and that he became loud and boisterous as the evening wore on. By the time Patterson left, Brown said, he was extremely intoxicated. Even though Brown was aware of Patterson's obvious intoxication, she never refused to serve Patterson any drinks, nor did she or any other Club employee take steps to see that Patterson was "cut off." Finally, of course, no Club employee made any effort

---

**2.** The Court expresses no opinion as to whether the service of a weird concoction such as a double peppermint schnapps and Coke, when consumed along with more conventional alcoholic beverages, is likely to exacerbate the normal effects of alcohol on the mind and body.

to see that Patterson did not drive home.[3] (Testimony of Charles Sherin, plaintiff's exhibit 73)

35. The NCO Club at Arlington Hall, at least on the evening of December 19, 1981, was far too crowded for the two bartenders to pay much attention to the state of the patrons it was serving. This is especially true with regard to patrons who were being served "vicariously," or those who were being served by their friends who would purchase several drinks from the bartender at once. (Testimony of Jeffrey Charles and Dorothy Brown)

36. Although the NCO Club did have several assistant managers on duty that evening, those managers had a number of administrative responsibilities which occupied most of their time. Therefore, the managers would have noticed only those patrons who exhibited extreme signs of intoxication, such as fighting, becoming ill, sleeping, or arguing loudly. (Testimony of Matthew Smith)

37. The bartenders at Arlington Hall received no formal training on recognizing an intoxicated patron. (Testimony of Matthew Smith)

38. In order for Patterson to have had a blood alcohol level of .26 at the hospital on the morning of the accident, he must have consumed approximately 17 ounces of 80 proof alcohol, or about 12 mixed drinks, while at the NCO Club between 10:15 and midnight. A person of Patterson's general build would certainly have been visibly affected in his manner, speech, motor coordination, and overall appearance by such a quantity of hard liquor prior to ordering his last drink. (Testimony of Dr. Harvey Cohen, Dorothy Brown)

39. In connection with the December 19, 1981 accident, Patterson pled guilty to manslaughter and was sentenced to one year in prison. He served three months of that sentence and was then paroled. (Plaintiff's exhibits 74 and 75)

40. After the December accident, Patterson did receive alcohol counseling. However, Patterson still refused to admit that he had an alcohol problem. Patterson missed appointments with his counselors, generally considered the group therapy sessions he attended to be a waste of time, and continued to drink. (Testimony of Patterson, Dr. Wise, and plaintiff's exhibit 59)

## III. FINDINGS OF FACT: DAMAGES

This matter comes before the Court on a trial to the bench on the damages aspect of the case on May 16, 1985. Pursuant to Rule 52(a), the Court makes the following findings of fact.

41. As a result of the accident on December 20, 1981, Maura Corrigan suffered extensive brain injuries. More specifically, Maura Corrigan has a nonfunctioning cerebral cortex and a severe lesion in her high brain stem. As a result of these injuries, Maura Corrigan is in a coma-like state,

---

3. When testifying at trial, over three years after the accident, Dorothy Brown could not recall seeing Patterson on the evening of the accident or telling Officer Sherin the details of what she observed that evening. However, she does not in any way dispute Officer Sherin's testimony or affidavit. Although the government objected to Officer Sherin's testimony regarding his discussion with Mrs. Brown, the Court allowed the testimony to come into evidence since the testimony is not hearsay under Rule 801(d)(2)(D). The disputed statements were offered against the United States, and were made by an agent or servant of the United States, Mrs. Brown, concerning a matter within the scope of her employment. Mrs. Brown's statements were made while she was still an employee of the United States. Therefore, each element of Rule 801(d)(2)(D) has been met.

In any event, even if the disputed statements were hearsay, the Court believes that they would be admissible under Rule 804(b)(5). Mrs. Brown is clearly "unavailable" as defined in Rule 804(a)(3), and the statements are highly probative of a critical fact in the case. The Court finds that Officer Sherin was a very credible witness, and that his testimony is clearly consistent with expert testimony which indicates that Patterson was probably exhibiting clearly visible signs of intoxication while in the bar. In light of the time which has passed since the night of the events in question here, and since Mrs. Brown's statements, made so soon after the night of the accident, are so probative in the case, this Court would have had no difficulty in admitting the statements under Rule 804(b)(5).

known as the persistent vegetative state, in which her mind is incapable of receiving or projecting information. (Testimony of Dr. White and Dr. Victor)

42. While Maura Corrigan is generally incapable of moving or speaking in this state, family members and medical personnel have reported that parts of her body may sporadically make certain movements in response to external stimuli. While the plaintiff's expert, Dr. White, interpreted those movements to mean that Maura Corrigan is capable of perceiving pain, the Court accepts the testimony of the defendant's expert neurologist, Dr. Victor. According to Dr. Victor, the movements described by the doctors and family members are purely primitive reflex movements; the neural mechanism necessary to perform these movements lies in the lower spinal cord, and not in the cerebral cortex. These movements are not unusual in patients who are in the persistent vegetative state. (Testimony of Dr. Victor)

43. Since the accident occurred on December 20, 1981, Maura Corrigan has had no mental or intellectual appreciation of any pain. (Testimony of Dr. Victor)

44. Maura Corrigan will never recover from the injuries suffered in the automobile crash. Based upon Maura Corrigan's present condition and the length of time other patients with similar injuries have survived, the Court finds that Maura Corrigan's life expectancy, with proper medical care, is 15 years from the date of the accident.[4] (Testimony of Dr. White and Dr. Victor)

45. As a direct result of the injuries suffered by Maura Corrigan in the December 20, 1981 automobile crash, Maura Corrigan has incurred medical expenses to date in the amount of $256,846.79. (Plaintiff's damage exhibits 1–4)

46. As a direct result of the injuries suffered by Maura Corrigan in the December 20, 1981 automobile crash, Maura Corrigan will incur medical expenses in the amount of $712,650.00 from now until she dies. (Plaintiff's damage exhibit 5, testimony of Dr. White and economist H. Alan Rosenthal)

47. As a direct result of the injuries suffered by Maura Corrigan in the December 20, 1981 automobile crash, Maura Corrigan will lose wages, over the course of her lifetime, in the amount of $362,650.00. (Plaintiff's damage exhibits 7–12, testimony of Mr. Rosenthal)

48. On December 29, 1983, John Corrigan, as the Guardian of Maura Corrigan, entered into a covenant not to sue with Patrick Patterson. In consideration for that covenant, Patterson paid John Corrigan the sum of $25,000. (Plaintiff's damage exhibit 51)

## IV. CONCLUSIONS OF LAW

Pursuant to Rule 52(a), the Court makes the following conclusions of law.

■ 1. Under the Federal Tort Claims Act, which gives this Court jurisdiction over civil tort actions against the United States, the Court is obliged to determine the government's liability in accordance with the law of the place where the act or omission occurred. 28 U.S.C. 1346(b). All of the government's acts of negligence, the resulting accident, and the plaintiff's injuries took place in Virginia, and therefore Virginia law controls the substantive elements of this litigation.

■ 2. Under Virginia law, a tavern owner who sells alcohol to a person who is either intoxicated or under the age of 21 may be found guilty of a misdemeanor. VA CODE § 4-62 (1983). Furthermore, such conduct by a tavern owner gives an

---

**4.** In its preliminary findings from the bench at the conclusion of the May 16, 1985 damages hearing, the Court announced that the plaintiff had an expected life expectancy of only ten years. However, in carefully reviewing the medical records and the testimony of the expert witnesses, the Court has concluded that the plaintiff has a life expectancy of 15 years. As a result, the Court has also modified its May 16, 1985 preliminary finding as to expected future medical expenses to reflect this longer life expectancy.

injured third person a cause of action against that tavern owner[5], provided that the injured person can prove that (1) a patron was on the tavern owner's premises; (2) that patron was served alcoholic beverages while on the premises even though that patron was intoxicated or underage; (3) the tavern owner knew or should have known, based upon industry standards, common experience, or actual knowledge, that the patron was intoxicated or underaged; (4) it was reasonably foreseeable that the patron would operate a motor vehicle after leaving the tavern owner's premises; (5) the patron did leave the premises and operate a motor vehicle; and (6) the patron's drunken driving caused the third person's death or injury.[6] *See Corrigan v. United States,* 595 F.Supp. 1047 (E.D.Va.1984); *see also Crowell v. Duncan,* 145 Va. 489, 134 S.E. 576 (1926).

*Sale of hard liquor to underage patron*

3. Under both Virginia law and the Army's own regulations, it is illegal to serve hard liquor to a patron under the age of 21. VA CODE § 4–62(1)(a) (1983), Army Regulations 210–65, para. 2. In spite of Virginia law and Army regulations, however, 19 year old Patrick Patterson was sold hard liquor at the NCO Club on the evening of December 19, 1981.

4. Laws prohibiting the sale of hard liquor to minors, such as § 4–62(1)(a), are clearly grounded in the belief that teenagers are not responsible enough to handle hard liquor and its deleterious effects upon the mind and body. *See Rappaport v.*

5. The Court expresses no opinion on whether, under Virginia common law, a social host may be held liable for serving alcohol to an intoxicated or underaged person whose subsequent drunken driving injures or kills a third person. For a further discussion of this point, *see Kelly v. Gwinnell,* 96 N.J. 538, 476 A.2d 1219 (N.J. 1984). *See also Cole v. City of Spring Lake Park,* 314 N.W.2d 836 (Minn.1982). We also do not address the question of whether a patron who injures himself while inebriated has a cause of action against a tavern owner who negligently sold him the alcohol. For a further discussion of this point, *see Ramsey v. Anctil,* 106 N.H. 375, 211 A.2d 900 (1965); *see also Thrasher v. Leggett,* 373 So.2d 494 (La.1979).

6. The vast majority of courts which have been faced with dram shop issues in the last 25 years have imposed civil liability upon tavern owners under the common law for the tavern owner's negligence in serving alcohol to underaged or intoxicated patrons. *See Nazareno v. Urie,* 638 P.2d 671 (Alaska 1981); *Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983); *Vesely v. Sager,* 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151 (1971); *Taylor v. Ruiz,* 394 A.2d 765 (Del.Super. 1978); *Marusa v. District of Columbia,* 484 F.2d 828 (D.C.Cir.1973); *Prevatt v. McClennan,* 201 So.2d 780 (Fla.App.1967); *Ono v. Applegate,* 62 Haw. 131, 612 P.2d 533 (1980); *Alegria v. Payonk,* 101 Idaho 617, 619 P.2d 135 (1980); *Colligan v. Cousar,* 38 Ill.App.2d 392, 187 N.E.2d 292 (1963); *Elsperman v. Plump,* 446 N.E.2d 1027 (Ind.Ct.App.1983); *Lewis v. State,* 256 N.W.2d 181 (Iowa 1977); *Pike v. George,* 434 S.W.2d 626 (Ky.App.1968); *Michnick-Zilberman v. Gordon's Liquor Store,* 390 Mass. 6, 453 N.E.2d 430 (Mass. 1983); *Thaut v. Finley,* 50 Mich.App. 611, 213 N.W.2d 820 (1973); *Trail v. Christian,* 298 Minn.

101, 213 N.W.2d 618 (1973); *Munford, Inc. v. Peterson,* 368 So.2d 213 (Miss.1979); *Deeds v. United States,* 306 F.Supp. 348 (D.Mont.1969); *Ramsey v. Anctil,* 106 N.H. 375, 211 A.2d 900 (1965); *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1 (1959); *Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269 (1982); *Berkeley v. Park,* 47 Misc.2d 381, 262 N.Y.S.2d 290 (1965); *Hutchens v. Hankins,* 63 N.C.App. 1, 303 S.E.2d 584 (1983); *Mason v. Roberts,* 33 Ohio St.2d 29, 294 N.E.2d 884 (1973); *Campbell v. Carpenter,* 279 Or. 237, 566 P.2d 893 (1977); *Speicher v. Reda,* 290 Pa.Super. 168, 434 A.2d 183 (1981); *Walz v. City of Hudson,* 327 N.W.2d 120 (S.Dakota 1982); *Mitchell v. Ketner,* 54 Tenn.App. 656, 393 S.W.2d 755 (1969); *Callan v. O'Neil,* 20 Wash.App. 32, 578 P.2d 890 (1978); *Sorensen v. Jarvis,* 119 Wis.2d 627, 350 N.W.2d 108 (1984); *contra, Carr v. Turner,* 238 Ark. 889, 385 S.W.2d 656 (1965); *Slicer v. Quigley,* 180 Conn. 252, 429 A.2d 855 (Sup.Ct.1980); *Keaton v. Kroger Co.,* 143 Ga. App. 23, 237 S.E.2d 443 (Ga.App.1977); *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981); *Alsup v. Garvin-Weinke, Inc.,* 579 F.2d 461 (8th Cir. 1978) (applying Missouri law); *Holmes v. Circo,* 196 Neb. 496, 244 N.W.2d 65 (1976); *Hamm v. Carson City Nugett, Inc.,* 85 Nev. 99, 450 P.2d 358 (1969).

Currently, 23 states have created dram shop liability through statutes or civil damage acts: Alabama, Alaska, California, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Maine, Michigan, Minnesota, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Utah, Vermont, and Wyoming. In all, 38 states and the District of Columbia have some form of dram shop liability.

Let the Clerk send a copy of this memorandum opinion to all counsel of record.

*Nichols,* 31 N.J. 188, 156 A.2d 1 (1959). Concern over the disproportionately high number of alcohol-related accidents involving young drivers, and over the special dangers presented when persons lacking in maturity and responsibility consume alcohol, has led legislators across the nation to call for higher minimum drinking ages. *See* 23 U.S.C. § 408 (1982). Therefore, tavern owners should be keenly aware that the sale of hard liquor to an underage patron, in an era where traveling by car to and from drinking establishments is so common and where accidents resulting from drinking are so frequent, presents an unreasonable risk of harm to others using the public roads.

5. By holding tavern owners liable for their sale of hard liquor to underaged patrons, the common law places no undue burden upon purveyors of alcohol. So long as the patron presents identification indicating that he or she is old enough to purchase the drink, and the tavern owner reasonably believes the identification is valid, the patron may be served.

6. It was reasonably foreseeable that any patron in the NCO Club on the evening of December 19, 1981 would drive after leaving the tavern. While there are service barracks located within walking distance of the NCO Club, the Club's popularity attracted service personnel throughout the area. The bartenders were aware that many patrons drove to the bar, and, short of asking the patrons themselves, had no way of distinguishing between patrons who drove and those who did not.

7. In spite of the clear and obvious dangers posed by the sale of inexpensive hard liquor to underage patrons, the Army freely sold hard liquor to all of its customers without any regard to the age of the customer. In the instant case, this grossly irresponsible policy allowed a young patron inexperienced with the effects of hard liquor to consume a large quantity of Jack Daniels bourbon, leave the club, and venture onto Virginia highways. Patterson's reckless driving on the morning of December 20, 1981, which culminated in the tragic accident, was a direct, predictable result of the Army's failure to abide by Virginia law and its own drinking regulations. *See Vance v. United States,* 355 F.Supp. 756 (D.Alaska 1973) (United States could be held liable under common law to intoxicated patron of Air Force NCO Club for injuries sustained by that patron after an agent of the United States negligently served alcohol to him); *see also Deeds v. United States,* 306 F.Supp. 348 (D.Montana 1969) (United States held liable under common law to third party for negligently serving alcohol to a minor serviceman in an Air Force NCO Club where the serviceman, after leaving the club, injured the third party in a drunken driving incident).

*Sale of liquor to an intoxicated patron*

8. Under Virginia law and Army regulations, it is also illegal to serve alcohol to an intoxicated patron. VA CODE § 4–62 (1983), Army Regulation 210–65. However, on the evening of December 19, 1981, the bartenders at the Army NCO Club served Patrick Patterson alcoholic beverages while he was intoxicated. Therefore, in addition to finding the government liable for selling alcohol to an underage patron, the Court also finds the government liable for serving an intoxicated patron.

9. Under Virginia law, a person is "intoxicated" if he has consumed enough alcohol to "so affect his manner, disposition, speech, muscular movement, general appearance or behavior, as to be apparent to observation." VA CODE § 4–2(14) (1983). This definition has been accepted and used by Virginia courts in civil cases as well as criminal cases, and therefore it is binding upon this Court in determining whether Patrick Patterson was intoxicated in the NCO Club on the night of the accident. *See Hill v. Lee,* 209 Va. 569, 166 S.E.2d 274 (1969).

10. In holding the government liable for serving alcohol to an intoxicated patron, the Court is aware that intoxication is something which can often be identified with absolute certainty only in hindsight.

Alcohol affects different persons in different ways, depending upon the consumer's physical characteristics and psychological state, the amount of food the person consumed prior to drinking, the individual's past experience with alcohol, the rate at which the alcohol is consumed, and the person's overall alcohol tolerance.

██ Nonetheless, the common law does not require a tavern owner to ascertain, with any great precision, the degree to which his customers are influenced by alcohol. Clearly, bartenders need not count the drinks that a customer consumes, administer a blood alcohol test, nor require a customer to perform feats of physical or mental agility before serving alcohol to that customer. The law only imposes upon the tavern owner the duty to exercise reasonable care in looking for visible signs which would indicate that a patron is intoxicated, such as poor coordination and slurred speech, before serving alcohol to that patron. In order to prevail under a common law dram shop theory of liability in Virginia, then, the plaintiff must not only show that the patron was intoxicated, but that the licensee knew or should have known that the patron was intoxicated at the time he or she was served. This standard does not place any undue burden upon the holders of liquor licenses in Virginia, especially since such licensees are in the daily business of selling alcoholic beverages and are presumed to have some expertise in recognizing signs of intoxication.

██ 11. After carefully examining all of the evidence in this case, the Court has no trouble in concluding that employees of the NCO Club knew or should have known that Patterson was intoxicated before Patterson was served his last drink. One experienced NCO Club bartender, Dorothy Brown, noted that Patterson was "extremely intoxicated" on the evening of the accident. Her testimony is corroborated by expert testimony which convinces the Court that Patterson, after consuming such a large quantity of hard liquor, must have exhibited clear signs of intoxication well before being served his last drink.

12. The NCO Club's failure to notice Patterson's visible intoxication is hardly surprising. The club was dimly lit, music was blaring, and the club was packed with customers creating a noisy din. Moreover, at that time, all of the drinks at the club were being served by two bartenders; the club had no waitresses. Therefore, the bartenders were under a great deal of pressure to serve drinks quickly to a large number of customers. Invariably, the large crowds around the bar and the absence of waitresses encouraged patrons to go to the bar and buy drinks for friends, who would wait behind at a table or on the dance floor. In short, the bartenders had little or no meaningful opportunity to observe most of the patrons who were being served drinks that evening.

However, the circumstances which made it so difficult to detect intoxicated patrons were created by the NCO Club in its effort to create a desirable atmosphere and to increase profits. By keeping the bar dimly lit, playing loud music, and keeping hired help to a minimum, the NCO Club cannot escape the responsibility, imposed by law upon all tavern owners, to determine whether the purchasers of the alcoholic beverages are intoxicated.

For decades, the Virginia courts have recognized that recklessness, tragedy and death follow predictably when alcohol and automobiles are mixed. *See Crowell v. Duncan*, 145 Va. 489, 134 S.E. 576 (1926). By serving such a large quantity of hard liquor to an intoxicated, underage patron without regard to the potential consequences, the NCO club breached a duty it owes to the community—the duty to stop pouring alcohol down the throat of a patron who, because of alcohol, has lost control over his judgment, his reflexes, and his sense of responsibility to others.

*Failure of Army to place Patterson in rehabilitation program*

13. Finally, plaintiff also claims that the United States should be held liable because it failed to (a) send along records of Patterson's May 1981 drunk driving incident to

Patterson's new duty station in Virginia and (b) place Patterson in an alcohol rehabilitation program as required by Army regulations. Under Army regulations 600–85 and 190–5, Patterson's first alcohol related accident, the May 1981 crash in California, should have been brought to the attention of Patterson's commanding officer. Such a notification would have assured Patterson's referral to the Army's ADAPCP program for alcohol rehabilitation. There is no indication in Patterson's Army records that the first drunk driving incident was ever brought to the attention of Patterson's commanding officer, nor is there any record that Patterson was referred to the ADAPCP program.

■■■ However, under Virginia law, failure to comply with the requirements of a legislative enactment or regulation constitutes actionable negligence only when the injured person is a member of the class for whose benefit the legislation or regulation was enacted. *See Butler v. Frieden*, 208 Va. 352, 158 S.E.2d 121 (1967); *see also Smith v. Virginia Transit Authority*, 206 Va. 951, 147 S.E.2d 110 (1966). All of the evidence in this matter clearly shows that the Army regulations, which evidently were not complied with in Patterson's case due to some clerical error, were created solely for the benefit of the Army and the service person with the alcohol problem, and not for the benefit of the general public. Therefore, plaintiff has not stated a cause of action under Virginia law.

■■■ 14. Moreover, even if plaintiff could state a cause of action under Virginia law for the Army's failure to abide by its own regulations, he would still have to prove that the Army's negligence in this respect was the proximate cause of the injury. *See Richardson v. Lovvorn*, 199 Va. 688, 101 S.E.2d 511 (1958). The evidence does not support such a finding here. First, the ADAPCP program which plaintiff claims that Patterson should have been placed in is not designed to promote long-term abstinence from alcohol; the central purpose of the program is to make its patients productive service members again.

Moreover, the program had a low success rate among young, enlisted personnel such as Patterson. Patterson's poor attitude toward his alcohol problem would have made rehabilitation even more difficult. In short, there is no reliable evidence that Patterson would not have been drinking on the evening of December 19, 1981 even if he had been enrolled in the Army's rehabilitation program.

■■■ 15. The common law places no duty upon quasi-parental institutions such as the military or colleges to establish any special procedure for monitoring and curbing the inclinations of its charges, many of whom are away from home for the first time, to consume alcohol. Programs such as the Army's ADAPCP are socially commendable efforts to deal with the problem of alcohol abuse, and the law should not discourage such efforts by creating liability to third persons when the program fails in a particular case. *See* VA CODE § 8.01–225 (1984) (exempting persons who render emergency care to an injured person from civil damages for any act or omissions in course of assistance).

*Damages*

■■■ 16. When awarding damages to a permanently incapacitated plaintiff under the Federal Tort Claims Act, the Court's primary concern must be to set a sum which will adequately cover the medical expenses until the incapacitated dies. Plaintiff is clearly entitled to recover for past and future medical expenses under the FTCA, provided these items can be proved with reasonable certainty. *See Hailes v. Gonzales*, 207 Va. 612, 151 S.E.2d 388 (1966).

17. Plaintiff here also claims damages for Maura Corrigan's lost earnings from the date of the accident based upon her expected earning capacity. An award of lost earnings is generally made so that the injured party can pay for those necessities and amenities which he would have provided for himself out of his earned income had he not been injured. Such an award is

usually proper under Virginia law, and therefore plaintiff would ordinarily expect to recover for these lost wages in this action. *Gwaltney v. Reed,* 196 Va. 505, 84 S.E.2d 501 (1954).

 However, in cases such as this one, the incapacitated plaintiff's personal expenses, such as food and housing, are included in the award for future medical expenses, which are calculated to provide full-time care in a nursing facility. Because the Federal Tort Claims Act limits the government's liability to compensation for injuries and expenses actually incurred, the Fourth Circuit has determined that in FTCA actions by incapacitated plaintiffs such as Maura Corrigan, any award for lost earnings must be reduced by the amount of the award for future medical expenses. *Flannery v. United States,* 718 F.2d 108 (4th Cir.1983). The Court has determined that Maura Corrigan's future medical expenses will exceed her projected lost future wages; therefore, plaintiff here can not recover any damages for those lost wages.

18. Furthermore, plaintiff claims that Maura Corrigan is entitled to damages for her past and future pain and suffering. *Bell v. Kirby,* 226 Va. 641, 311 S.E.2d 799 (1984). However, because the Court has determined that Maura Corrigan cannot feel pain in her comatose condition, the plaintiff is not entitled to any award for pain and suffering. Therefore, the Court's damage award is calculated only on the basis of past and projected future medical expenses.

19. Pursuant to the Federal Tort Claims Act, and in accordance with the above findings of fact and conclusions of law, the Court finds that the defendant is liable to the plaintiff in the amount of $969,496.79. 28 U.S.C. 1346(b).

20. From the sum of $969,496.79, the United States is entitled to an off-set in the amount of $25,000 in light of the covenant not to sue agreement between John Corrigan and Patrick Patterson. VA CODE § 8.01–35.1(A)(1) (1984).

21. As provided by the Federal Tort Claims Act, the Court awards 25% of the remaining $944,496.79, or $236,124.20, to the attorneys for Mr. Corrigan as attorney's fees in this action. 28 U.S.C. § 2678.

22. Out of the remaining $708,372.59, plaintiff is required to remit the sum of $42,058.36 to the appropriate department of public welfare in the State of Ohio pursuant to the state's statutory subrogation rights. OHIO REV.CODE ANN. § 5101.58 (1984).