497 A.2d 1143

**Olen J. KELLEY et ux.**

**v.**

**R.G. INDUSTRIES, INC. et al.**

**Misc. No. 20, Sept. Term, 1983.**

Court of Appeals of Maryland.

Oct. 3, 1985.

Motion for Reconsideration Denied Nov. 22, 1985.

126

Howard L. Siegel and Barry H. Helfand, Rockville, for appellants.

Gerard P. Uehlinger and Lentz, Hooper, Jacobs & Blevins, Baltimore, on amicus curiae brief of Foundation for Handgun Educ.

Edward S. Digges, Jr., and Piper & Marbury, Baltimore, and James P. Dorr, Anne G. Kimball, and Wildman, Har-

rold, Allen & Dixon, Chicago, Ill., on amicus curiae brief of Colt Firearms Div. of Colt Industries Inc., Smith & Wesson, A Div. of Bangor Punta Corp., Sturm, Ruger & Co., Inc.

Thomas M. Baumann (Hardwick, Tripoda & Harris, on brief, Baltimore, and James B. Sales, Frank G. Jones, Louis S. Zimmerman and Fullbright & Jaworski, of counsel, on brief, Houston, Tex., for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially assigned.

ELDRIDGE, Judge.

This case comes to us by an Order of Certification from the United States District Court for the District of Maryland.[1] The issues concern whether a handgun manufacturer or marketer might be liable under some circumstances for gunshot injuries caused by the use of one of its handguns during the commission of a crime.

## I.

Olen J. Kelley was injured when an unnamed assailant shot him in the chest during an armed robbery of the grocery store where he was employed. The weapon used in the crime was a Rohm Revolver Handgun Model RG–38S, Serial Number 0152662, designed and marketed by Rohm Gesellschaft, a West German corporation. The handgun was assembled and initially sold by R.G. Industries, Inc., a Miami-based corporation which is a subsidiary of the West German corporation.

---

* Davidson, J., participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion of the Court.

1. Uniform Certification of Questions of Law Act, Maryland Code (1974, 1984 Repl.Vol.), § 12–601 *et seq.* of the Courts and Judicial Proceedings Article.

Kelley and his wife filed a tort action against Rohm Gesellschaft and R.G. Industries in the Circuit Court for Montgomery County, setting forth several theories for recovery. The first count was based on strict liability, with the plaintiffs claiming that the handgun was "abnormally dangerous." Count two, also sounding in strict liability, alleged that the handgun was defective in its "marketing, promotion, distribution and design," rendering it "unreasonably dangerous." Count three rested on a negligence theory. In a fourth count, the plaintiffs sought damages for loss of consortium.

One of the defendants, R.G. Industries, had the case removed to the United States District Court for the District of Maryland, pursuant to 28 U.S.C. §§ 1441 and 1446. R.G. Industries then filed an answer to the declaration and moved for summary judgment on the ground that it was not involved in the marketing or distribution of the handgun in question. Thereafter the parties filed a stipulation that R.G. Industries be dismissed from the case, without prejudice.

The remaining defendant, Rohm Gesellschaft, moved to dismiss the declaration for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rohm argued in its memorandum in support of the motion to dismiss that "the [p]laintiffs' contentions [must] fail because the handgun performed as it was supposed to perform and because Rohm Gesellschaft is not responsible for the criminal and tortious acts of Mr. Kelley's assailant." At a hearing on the motion, the United States District Court found that there were no controlling precedents in this Court on the strict liability issues and certified the following questions to us:

*"Question 1*

Is a handgun, which inflicts injury as the norm, rather than the exception, a defective or unreasonably dangerous product?

*"Question 2*

Is the marketing of handguns an abnormally dangerous activity?

(a) Does the abnormally dangerous activity doctrine extend to instances in which the alleged tortfeasor is not an occupier of land?

(b) Does the abnormally dangerous activity doctrine apply where harm is brought about by some third person or persons over whom the tortfeasor had no control?"

Oral argument was then held before this Court. As a result of matters raised at oral argument which were not specifically addressed in the certification order, the plaintiffs requested that the order be withdrawn and that a new order be filed. Pursuant to the request, the United States District Court withdrew the original Order of Certification and substituted a "Further Order of Certification" posing the following four questions:

*"Question 1*

Is a handgun, which inflicts injury as the norm, rather than the exception, a defective or unreasonably dangerous product?

If the answer to Question 1 is "No," then

*"Question 2*

Is a Rohm Revolver Handgun Model RG38S, which inflicts injury as the norm, rather than the exception, a defective or unreasonably dangerous product?

*"Question 3*

Is the marketing of handguns an abnormally dangerous activity? In answering this question, it may be that the Court of Appeals of Maryland may desire to address itself to the following sub-questions:

(a) Does the abnormally dangerous activity doctrine extend to instances in which the alleged tortfeasor is not an occupier of land?

(b) Does the abnormally dangerous activity doctrine apply where harm is brought about by some third person or persons over whom the tortfeasor had no control?

If the answer to Question 3 is "No," then

*"Question 4*

Is the marketing of Rohm Revolver Handguns Model RG38S an abnormally dangerous activity? In answering this question, it may be that the Court of Appeals of Maryland may desire to address itself to the following sub-questions:

(a) Does the abnormally dangerous activity doctrine extend to instances in which the alleged tortfeasor is not an occupier of land?

(b) Does the abnormally dangerous activity doctrine apply where harm is brought about by some third person or persons over whom the tortfeasor had no control?"

In addition, the Further Order of Certification provided that this Court was not restricted in its consideration and determination of the matter by the phrasing of the certified questions.

In considering the certified questions, and pursuant to the above-mentioned provision in the federal court's order, we have rephrased the questions as follows:

1) Is the manufacturer or marketer of a handgun, in general, liable under any strict liability theory to a person injured as a result of the criminal use of its product?

2) Is the manufacturer or marketer of a particular category of small, cheap handguns, sometimes referred to as "Saturday Night Specials," and regularly used in criminal activity, strictly liable to a person injured by such handgun during the course of a crime?

3) Does the Rohm Revolver Handgun Model RG38S, serial number 0152662, fall within the category referred to in question 2?

The first question will be addressed in Part II of this opinion, the second in Part III, and the final question in Part IV.

## II.

Kelley maintains that a manufacturer and marketer of a handgun, which inflicts injuries such as his, should be held liable under either of two strict liability theories. First, Kelley asserts that the manufacturer or marketer is strictly liable because the manufacturing or marketing of handguns is an "abnormally dangerous activity." Restatement (Second) of Torts, §§ 519–520. Second, Kelley argues that the manufacturer or marketer is strictly liable because handguns are "abnormally dangerous products" under Restatement (Second) of Torts, § 402A. For the following reasons, however, neither of these two doctrines, nor any of the other previously recognized strict liability principles, could properly be applied to hold, in general, the manufacturer or marketer of a handgun liable to a person injured by the handgun during the course of a crime.[2]

## A.

■ Kelley's first premise for the imposition of liability is under the Restatement (Second) of Torts, §§ 519 and 520. These sections recognize the liability of one engaged in an abnormally dangerous or ultrahazardous activity even though that person may have exercised the utmost care to prevent harm. Whether an activity is "abnormally dangerous" under these sections depends on its satisfying the following six factors, specified in § 520:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

---

**2.** Such situation is, of course, distinguishable from an injury inflicted when a handgun malfunctions. In the latter case, there may be recovery, in appropriate circumstances, under settled principles of products liability law.

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes." [3]

■ Regardless, however, of whether a handgun might satisfy these factors, Maryland law would not permit liability to be imposed on a handgun manufacturer or marketer under this theory. This Court has refused to extend the abnormally dangerous activity doctrine to instances in which the alleged tortfeasor is not an owner or occupier of land. *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 4 A.2d 757 (1939). *See also Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969); *Kirby v. Hylton*, 51 Md.App. 365, 443 A.2d 640 (1982).

The thrust of the doctrine is that the activity be abnormally dangerous in relation to the area where it occurs. If a gasoline station owner has faulty tanks which leak gasoline into the underground water supply, that might be abnormally dangerous if the land in which the tanks are buried is located in a well populated area. In such a situation, the hazard bears a relation to the occupation and location of the land on which the activity occurs. *See Yommer v. McKenzie, supra.* The dangers inherent in the use of a handgun in the commission of a crime, on the other hand, bear no relation to any occupation or ownership of land. Therefore, the abnormally dangerous activity doctrine does not apply to the manufacture or marketing of handguns.

Other jurisdictions which have addressed the issue are in accord. *See, e.g., Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1268 (5th Cir.1985), *rev'g Richman v. Charter Arms Co.*,

---

**3.** For a discussion advocating the imposition of liability upon handgun manufacturers under this theory, *see* S. Speiser, *Disarming the Handgun Problem by Directly Suing Arms Makers*, Nat'l L.J., June 8, 1981, at 29, col. 1.

571 F.Supp. 192 (E.D.La.1983) ("[marketing handguns] is not a land-related activity, and the injuries of which the plaintiffs complain were not caused by the marketing itself, but rather resulted only when there was substandard conduct on the part of third parties"); *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200, 1203–1204 (7th Cir. 1984) (ultrahazardous activity doctrine applies only to the use of a product, not to its manufacture or sale); *Riordan v. International Armament Corp.*, 132 Ill.App.3d 642, 87 Ill.Dec. 765, 769, 477 N.E.2d 1293, 1297 (1985) ("We have found no decision other than *Richman* that has held that the lawful sale of a non-defective product can be an ultrahazardous activity."); *Burkett v. Freedom Arms*, 299 Or. 551, 704 P.2d 118 (1985). *See also* Note, *Legal Limits of a Handgun Manufacturer's Liability for the Criminal Acts of Third Persons*, 49 Mo.L.Rev. 830 (1984) (criticizing the imposition of liability under the ultrahazardous activity doctrine).

### B.

Kelley next contends that a handgun is an abnormally dangerous product, and he argues that a handgun manufacturer or marketer should be strictly liable according to Restatement (Second) of Torts, § 402A. Section 402A provides that:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ Maryland adopted § 402A in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). In so doing, this Court held that in order for a plaintiff to recover under this theory, he must establish that:

"(1) the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition."

278 Md. at 344, 363 A.2d 955. *See also, e.g., Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985); *Sheehan v. Anthony Pools*, 50 Md.App. 614, 440 A.2d 1085 (1982), *aff'd.*, 295 Md. 285, 455 A.2d 434 (1983); *Eaton Corp. v. Wright*, 281 Md. 80, 375 A.2d 1122 (1977).

*Phipps* and its progeny expressly require that the product be defective when sold. In determining whether a product is defective, in its design or its manufacture, Maryland cases have generally applied the "consumer expectation" test. As this Court explained in *Phipps:*

"[f]or a seller to be liable under § 402A, the product must be both in a 'defective condition' and 'unreasonably dangerous' at the time that it is placed on the market by the seller. Both of these conditions are explained in the official comments in terms of consumer expectations. As Comment g explains, the requirement of a defective condition limits application of § 402A to those situations where 'the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' An 'unreasonably dangerous product is defined in Comment i as one which is 'dangerous to an extent beyond that which would be contemplated by the ordinary con-

sumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'"
278 Md. at 344, 363 A.2d 955.

■ A handgun manufacturer or marketer could not be held liable under this theory. Contrary to Kelley's argument, a handgun is not defective merely because it is capable of being used during criminal activity to inflict harm. A consumer would expect a handgun to be dangerous, by its very nature, and to have the capacity to fire a bullet with deadly force. Kelley confuses a product's *normal function*, which may very well be dangerous, with a defect in a product's design or construction. For example, an automobile is a dangerous product, if used to run down pedestrians. In such situation, injury would result from the nature of the product—its ability to be propelled at a great speed with great force. But that same automobile might also be defective in its design or construction, *e.g.*, if the gasoline tank were placed in such position that it could easily explode in a rear-end collision. Only in the second instance, regarding the placement of the gasoline tank, would the design of the product be defective, exposing the product's manufacturer to liability under § 402A. Similarly, a handgun is dangerous because its normal function is to propel bullets with deadly force. That alone is not sufficient for its manufacturer to incur liability under § 402A. For the handgun to be defective, there would have to be a problem in its manufacture or design, such as a weak or improperly placed part, that would cause it to fire unexpectedly or otherwise malfunction.

Another test used to determine whether a design defect exists under § 402A is the "risk/utility" test, applied in *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). In *Barker*, the plaintiff machinery operator sued the defendant manufacturer for injuries received while trying to escape from the malfunctioning machinery. The plaintiff alleged that the machinery was defective because it was not equipped with certain safety devices. The plaintiff appealed from a jury's verdict

for the defendants, arguing that the trial court had erred in instructing the jury that strict liability for a product design must be " 'based on a finding that the product was unreasonably dangerous for its intended use.' " 20 Cal.3d at 422, 143 Cal.Rptr. 225, 573 P.2d 443. The Supreme Court of California agreed with the plaintiff, and reversed. In so doing, the court articulated a dual definition for a design defect, the second part of which rests on a balancing of the product's risks and utilities (20 Cal.3d at 432, 143 Cal.Rptr. 225, 573 P.2d 443):

> "[A] product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."

Since the *Barker* decision, numerous jurisdictions have adopted a risk/utility test as an alternate standard for the determination of design defects under § 402A. *See, e.g., Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979); *Rucker v. Norfolk & W. Ry. Co.,* 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979); *Hunt v. City Stores, Inc.,* 387 So.2d 585 (La.1980); *Back v. Wickes Corp.,* 375 Mass. 633, 378 N.E.2d 964 (1978); *Duke v. Gulf & Western Mfg. Co.,* 660 S.W.2d 404 (Mo.App.1983); *Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978); *Wilson v. Piper Aircraft Corp.,* 282 Or. 61, 577 P.2d 1322 (1978).

While no decision of this Court in a product liability case has expressly rested upon an application of the risk/utility test, we did state in *Phipps* that "in some circumstances the

question of whether a particular design is defective may depend upon a balancing of the utility of the design and other factors against the magnitude of that risk." 278 Md. at 348, 363 A.2d 955. Also, the Court of Special Appeals in *Sheehan v. Anthony Pools, supra,* 50 Md.App. at 620 n. 6, 440 A.2d 1085, in referring to the factors used in the risk/utility analysis, said that "[t]hese factors rationalize what most courts do in deciding design cases, although not all the factors are necessarily weighed nor is the risk/utility analysis denominated as such." *Ibid.*

■ We believe, however, that the risk/utility test is inapplicable to the present situation. This standard is only applied when something goes wrong with a product. In *Barker,* an unbalanced machine tipped over. In *Back v. Wickes Corp., supra,* a motor home exploded, and in *Duke v. Gulf & Western Mfg. Co., supra,* a power press caught the plaintiff's hands. These products malfunctioned. On the other hand, in the case of a handgun which injured a person in whose direction it was fired, the product worked precisely as intended. Therefore, the risk/utility test cannot be extended to impose liability on the maker or marketer of a handgun which has not malfunctioned.

In sum, regardless of the standard used to determine whether a product is "defective" under § 402A, a handgun which functions as intended and as expected is not "defective" within the meaning of that section. This has been the consistent conclusion in other jurisdictions which have confronted the issue.

For example, in *Patterson v. Rohm Gesellschaft,* 608 F.Supp. 1206 (N.D.Tex.1985), plaintiff's decedent died from gunshot wounds inflicted by a .38 caliber Rohm during a crime. The plaintiff argued that the gun's manufacturer was strictly liable under § 402A. Rejecting the "defective design" claim, the court stated that "a gun, by its very nature, must be dangerous and must have the capacity to discharge a bullet with deadly force." 608 F.Supp. at 1212.

Similarly, in *Riordan v. International Armament Corp.*, *supra*, the court rejected the plaintiff's contention that a handgun was defectively designed because it was small and easily concealable, saying, "[the] size and concealability of the defendants' handguns were not conditions which caused the handgun to fail to perform in the manner reasonably to be expected in light of its nature and intended function." 87 Ill.Dec. at 770, 477 N.E.2d at 1298. The court held that a handgun could not be deemed defective "where the plaintiff's injury was caused by that product's operation precisely as it was designed to operate." *Ibid. Accord, Richman v. Charter Arms Co.*, 571 F.Supp. 192, 196–197 (E.D.La. 1983), *rev'd on other grounds, Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1268 (5th Cir.1985); *Martin v. Harrington and Richardson, Inc., supra*, 743 F.2d 1200; *Francis v. Diamond International Corp.*, Nos. CV82–11–1279 and CV83–02–0215 (Ct. of Com.Pl., Butler County Ohio, March 22, 1983), *appeal noted,* No. CA–84–09–111, Ohio Court of Appeals. *See, in addition,* Makarevick, *Manufacturers' Strict Liability for Injuries From a Well-Made Handgun,* 24 Wm. & Mary L. Rev. 467 (1983) (criticism of both negligence and strict liability theories as bases for imposing liability); Santarelli and Calio, *Turning the Gun on Tort Law: Aiming at Courts to Take Products Liability to the Limit,* 14 St. Mary's L.J. 471 (1983) (arguing that existing products liability theories cannot be extended to hold handgun manufacturers liable); Note, *Handguns and Products Liability,* 97 Harv.L.Rev. 1912 (1984) (handgun manufacturers should not be liable under either design defect or defective distribution theories). *But cf.,* Turley and Harrison, *Strict Tort Liability of Handgun Suppliers,* 6 Hamline L.Rev. 285 (1983) (favoring imposition of liability under § 402A).[4]

---

**4.** Courts have also rejected liability under various other theories. For example, two federal cases were dismissed in light of the particular state law regarding product liability. *Mavilia v. Stoeger Industries,* 574 F.Supp. 107 (D.Mass.1983) (In the absence of negligence, Massachusetts only recognizes product liability under a warranty theory; no

## C.

■ The fact that a handgun manufacturer or marketer generally would not be liable for gunshot injuries resulting from a criminal's use of the product, under previously recognized principles of strict liability, is not necessarily dispositive. This Court has repeatedly said that "the common law is not static; its life and heart is its dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems." *Harrison v. Mont. Co. Bd. of Educ.*, 295 Md. 442, 460, 456 A.2d 894 (1983). *See Felder v. Butler*, 292 Md. 174, 182, 438 A.2d 494 (1981). The common law is, therefore, subject to judicial modification in light of modern circumstances or increased knowledge. *Jones v. State*, 302 Md. 153, 161, 486 A.2d 184 (1985); *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983); *Condore v. Prince George's Co.*, 289 Md. 516, 425 A.2d 1011 (1981). Indeed, we have not hesitated to change the common law to permit new actions or remedies where we have concluded that such course was justified. *Boblitz v. Boblitz, supra* (authorizing negligence action by one spouse against another); *Moxley v. Acker*, 294 Md. 47, 447 A.2d 857 (1982) (changing common law so as to permit an action of forcible detainer even though force is not present); *Adler v. American Standard*

breach of warranty when product performs as it should); *Bennett v. Cincinnati Checker Cab Co., Inc.*, 353 F.Supp. 1206 (E.D.Ky.1973) (plaintiff failed to allege particular product defect under Kentucky law; manufacturer not responsible for criminal acts of third parties).

In *Linton v. Smith & Wesson*, 127 Ill.App.3d 676, 82 Ill.Dec. 805, 469 N.E.2d 339, *appeal den.*, 101 Ill.2d 582 (1984), the court affirmed the dismissal of the plaintiff's complaint because, under Illinois law, no common law duty existed upon the manufacturer of a nondefective handgun to control the distribution of the product to the general public.

Also, some trial courts have dismissed cases without explanation. *Shipman v. Jennings Firearms, Inc.*, No. 83–6511–CIV–Roettger (United States District Court for the Southern District of Florida, April 26, 1985); *Haviland v. Sturm, Ruger Co.*, No. L–2369 (Cir.Ct. of Blount County, Tennessee, February 18, 1983); *Gebhardt v. Bangor Punta Operations, Inc.*, No. 81–40059 (United States District Court for the Eastern District of Michigan, October 15, 1981).

*Corp.*, 291 Md. 31, 432 A.2d 464 (1981) (recognizing tort of abusive or wrongful discharge); *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978) (refusing to recognize interspousal immunity with regard to outrageous intentional torts); *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977) (recognizing tort of intentional infliction of emotional distress).

On the other hand, we have consistently recognized that common law principles should not be changed contrary to the public policy of the State set forth by the General Assembly of Maryland. *Harrison v. Mont. Co. Bd. of Educ., supra*, 295 Md. at 460–461, 456 A.2d 894; *Condore v. Prince George's Co., supra*, 289 Md. at 532, 425 A.2d 1011; *Austin v. City of Baltimore*, 286 Md. 51, 55–56 (majority opinion), 67–70 (Smith and Eldridge, JJ., concurring), 405 A.2d 255, 263 (1979).

By Ch. 13 of the Acts of 1972, the Maryland General Assembly enacted a comprehensive regulatory scheme concerning the wearing, carrying and transporting of handguns, codified under the subtitle "Handguns" at Maryland Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.), Art. 27, §§ 36B–36G.

The subtitle begins with a declaration of the State's policy, in § 36B(a), that:

"(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the

peace and tranquility of the State and to protect the rights and liberties of its citizens."

To effectuate that policy, the Legislature generally made it unlawful for persons to wear, carry or transport handguns, whether openly or concealed. § 36B(b).[5] Section 36B(c) also provides certain limited exceptions to the prohibition.[6] Law enforcement personnel, both State and feder-

---

5. Art. 27, § 36B(b) provides, in pertinent part:

"(b) *Unlawful wearing, carrying, or transporting of handguns; penalties.*—Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun. . . ."

6. Section 36B(c) includes the following exceptions:

"(c) *Exceptions.*—(1) Nothing in this section shall prevent the wearing, carrying, or transporting of a handgun by (i) law-enforcement personnel of the United States, or of this State, or of any county or city of this State, (ii) members of the armed forces of the United States or of the National Guard while on duty or traveling to or from duty; or (iii) law-enforcement personnel of some other state or subdivision thereof temporarily in this State on official business; (iv) any jailer, prison guard, warden, or guard or keeper at any penal, correctional or detention institution in this State; or (v) sheriffs and temporary or full-time sheriffs' deputies, as to all of whom this exception shall apply only when they are on active assignment engaged in law enforcement; provided, that any such person mentioned in this paragraph is duly authorized at the time and under the circumstances he is wearing, carrying, or transporting the weapon to wear, carry, or transport such weapon as part of his official equipment.

\*     \*     \*     \*     \*     \*

"(3) Nothing in this section shall prevent any person from carrying a handgun on his person or in any vehicle while transporting the same to or from the place of legal purchase or sale, or between bona fide residences of the individual, or between his bona fide residence and his place of business, if the business is operated and substantially owned by the individual, or to or from any bona fide repair shop. Nothing in this section shall prevent any person from wearing, carrying, or transporting a handgun used in connection with a target shoot, formal or informal target practice, sport shooting event, hunting, trapping, dog obedience training class or show or any organized military activity while engaged in, on the way to,

al, as well as persons in the military, are permitted to carry handguns. Exceptions are also created for persons engaged in hunting and target practice, and for home and business protection if confined to the real estate owned or leased by the persons having the handguns. An allowance is also made for a person who does not fit within any of those exceptions, but who, under § 36E, has proven, upon application to the Maryland State Police, that he has "good and substantial reason" to carry a handgun and meets certain other qualifications.[7]

---

or returning from any such activity. Nothing in this section shall prevent any bona fide gun collector from moving any part or all of his gun collection from place to place for public or private exhibition. However, while traveling to or from any such place or event referred to in this paragraph, a handgun shall be unloaded and carried in an enclosed case or enclosed holster.

"(4) Nothing in this section shall prevent a person from wearing, carrying, or transporting a handgun within the confines of real estate owned or leased by him or upon which he resides or within the confines of a business establishment owned or leased by him. Nothing in this section shall prevent a supervisory employee from wearing, carrying, or transporting a handgun within the confines of a business establishment in which he is employed during such time as he is acting in the course of his employment and has been authorized to wear, carry, or transport the handgun by the owner or manager of the business establishment.

"(5) Nothing in this section shall prevent a person from carrying or transporting any signal pistol or other visual distress signal approved by the United States Coast Guard, in any vessel used upon the waterways of this State, or if unloaded and carried in an enclosed case, in any vehicle."

7. This exception is first stated in § 36B(c)(2), which states that:
"(2) Nothing in this section shall prevent the wearing, carrying, or transporting of a handgun by any person to whom a permit to wear, carry or transport any such weapon has been issued under § 36E of this article."

Art. 27, § 36E provides, in pertinent part:
"(a) *Issuance.*—A permit to carry a handgun shall be issued within a reasonable time by the Superintendent of the Maryland State Police, upon application under oath therefor, to any person whom he finds:
(1) Is eighteen years of age or older; and
(2) Has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than one year has been imposed or, if convicted of such a crime, has been pardoned or has

■ The express statutory provisions allowing persons to possess and carry handguns in certain specified instances demonstrate that not all handguns or handgun usage is inconsistent with Maryland public policy. In our view, generally to impose strict liability upon the manufacturers or marketers of handguns for gunshot injuries resulting from the misuse of handguns by others, would be contrary to Maryland public policy as set forth by the Legislature.

## III.

There is, however, a limited category of handguns which clearly is not sanctioned as a matter of public policy. To impose strict liability upon the manufacturers and marketers of these handguns, in instances of gunshot wounds caused by criminal use, would not be contrary to the policy embodied in the enactments of the General Assembly. This type of handgun, commonly known as a "Saturday Night Special,"[8] presents particular problems for law enforce-

---

been granted relief pursuant to Title 18, § 925(c) of the United States Code; and

(3) Has not been committed to any detention, training, or correctional institution for juveniles for longer than one year after an adjudication of delinquency by a juvenile court; provided, however, that a person shall not be disqualified by virtue of this paragraph (3) if, at the time of the application, more than ten years has elapsed since his release from such institution; and

(4) Has not been convicted of any offense involving the possession, use, or distribution of controlled dangerous substances; and is not presently an addict, an habitual user of any controlled dangerous substance not under legitimate medical direction or an alcoholic; and

(5) Has, based on the results of investigation, not exhibited a propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons; and

(6) Has, based on the results of investigation, good and substantial reason to wear, carry, or transport a handgun, provided however, that the phrase 'good and substantial reason' as used herein shall be deemed to include a finding that such permit is necessary as a reasonable precaution against apprehended danger."

8. The term "Saturday Night Special" originated in Detroit, where officials first noted the frequency with which these cheap, easily

ment officials.[9]   Saturday Night Specials are generally characterized by short barrels, light weight, easy conceala-

concealable handguns were used in crimes and violent acts "which far too often mar the urban weekend."   118 Cong.Rec. 21, 27029 (1972). This term is generally used to describe a small, cheap handgun used in criminal activity.   *York v. State*, 56 Md.App. 222, 227, 467 A.2d 552 (1983), *cert. denied*, 299 Md. 137, 472 A.2d 1000 (1984); *United States v. Looney*, 501 F.2d 1039, 1040 (4th Cir.1974); *R.G. Industries, Inc. v. Askew*, 276 So.2d 1, 2 (Fla.1973).

**9.**   Geoffrey Alprin, General Counsel of the Metropolitan Police Department, Washington, D.C., testified before the Senate Committee on the Judiciary regarding Saturday Night Specials:

"Specifically, 'Saturday night specials,' because of their poor construction and low quality, are extremely dangerous weapons, not only to intended targets and bystanders, but also to the user himself. They misfire, fire accidentally, and backfire with some degree of regularity.   They are notoriously inaccurate at even short distances.

"Furthermore, the low-grade components used in these weapons, in addition to the fact that many of the parts are foreign-made at reduced labor costs, result in their mass production and extremely low retail prices.   A reasonably safe American-made .22 caliber revolver retails in this country for over $50.   Many of the 'Saturday night specials' can be purchased here for between $10 and $20 and less, I might add.   Thus, the weapon is accessible to almost anyone who wants one at no more than a few dollars. . . .

"It should also be noted that the 'Saturday night special' presents law enforcement problems in tracing and identifying such weapons when they are used to commit criminal offenses.   Generally, the weapon is manufactured from soft, inexpensive metal.   As a result, serial numbers are easily and sometimes completely erased by either filing or melting.   And ballistics examination of such weapons, in order to determine if a fired bullet was discharged from a recovered weapon, is many times made impossible because the metal in the weapon is of such low quality that the characteristics of the barrel are altered every time the weapon is fired."

Hearings on S. 2507 Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary, 92nd Cong., 1st sess. at 109–110 (1971) (hereafter cited as "Handgun Control Hearings").   Similar testimony was given by James Conlisk, Superintendent of Police, Chicago, Illinois, *id.* at 122–123; and Clarence Kelley, Chief of Police, Kansas City, Missouri, *id.* at 352–353.

*See also* S.Rep. No. 1097, 90th Cong., 2d sess. at 109, U.S.Code Cong. & Admin.News 1968, pp. 2112, 2199, cited *infra* at note 14.

Support is also found in statistical studies of handguns used in crime confiscated by police in major urban centers.   One such study showed that 69% of handguns used in robbery, 69% of handguns used in homicides, and 75% of handguns seized that were used in assaults were the small, "crime-related handgun" with barrel lengths of less than 3 inches.   Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of Justice, *Concentrated Urban Enforcement: An Analysis of the Initial*

bility, low cost, use of cheap quality materials, poor manufacture, inaccuracy and unreliability. These characteristics render the Saturday Night Special particularly attractive for criminal use and virtually useless for the legitimate purposes of law enforcement, sport, and protection of persons, property and businesses.[10]

---

*Year of Operation CUE in the Cities of Washington, D.C., Boston, Ma., and Chicago, Ill.* (1977) at 96–98. Price data from this study indicated that approximately 40% of the guns seized retailed for under fifty dollars. A similar study, based on statistics from sixteen major cities, revealed that 71% of the handguns seized during the study period were of the short-barrelled, easily concealable variety. Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of Justice, *Project Identification: A Study of Handguns Used in Crime* (1976) at 11, 21.

*But cf.* Brill, *The Traffic (Legal and Illegal) in Guns,* Harper's, Sept. 1977, at 37–44 (arguing that well-made handguns account for a large percentage of crime weapons).

**10.** *See generally,* Bruce-Briggs, *The Great American Gun War,* 45 Pub.Interest 37 (1976); Cook, *The "Saturday Night Special": An Assessment of Alternative Definitions From a Policy Perspective,* 72 J.Crim. & Criminology 1735 (1981); Iveson, *Manufacturers' Liability to Victims of Handgun Crime: A Common-Law Approach,* 51 Fordham L.Rev. 771, 790–792 (1983); Cox Newspaper Series, "The Snub-Nosed Killers: Handguns in America" (Dec. 1981), reprinted in Handgun Control Legislation: Hearings Before the Subcomm. of Criminal Law of the Senate Comm. on the Judiciary, 97th Cong., 2d sess. at 113–152 (1982).

Maxwell Rich, Executive Vice President of the National Rifle Association, testified in Senate hearings that:

"[Saturday Night Specials] have never to my knowledge been accepted for advertising in our official journal, the American Rifleman. Our reason is that they have no sporting purpose, they are frequently poorly made, and they do not represent value received to any purchaser."

*Handgun Control Hearings, supra,* at 315. Eugene Rossides, Assistant Secretary of the Treasury, also testified at those hearings (*id.* at 132):

"We are all generally familiar with the problems presented by the so-called 'Saturday night specials.' ... Such handguns are inaccurate, unreliable, and unsafe, and do not serve sporting purposes or law enforcement or self-protection needs."

Patrick Murphy, Police Commissioner of the City of New York, added (*id.* at 177):

"There is absolutely no legitimate reason to permit the importation, manufacture, or sale of these weapons, or their parts. They are sought only by people who have illicit motives, but who may have some difficulty securing a better gun. No policemen, no Army

### A.

The legislative policies of both the United States Congress and the Maryland General Assembly reflect the view that "Saturday Night Specials" comprise a distinct category of handguns that, because of their characteristics, should be treated differently from other handguns.

### (1)

The Gun Control Act of 1968 was originally enacted by Congress as Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 921 *et seq.* The Act prohibits, *inter alia,* the importation into the United States of Saturday Night Specials by banning the importation of *any* firearm [11] or ammunition not specifically excepted. Section 922, titled "Unlawful acts," provides in pertinent part:

"(*l*) Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter."

Section 925, titled "Exceptions: Relief from disabilities," allows the importation of firearms for the use of law enforcement, military, or other governmental purposes, § 925(a), and then further provides:

"(d) The Secretary [of the Treasury] may authorize a firearm or ammunition to be imported or brought into the

---

officer, no security guard, no businessman or merchant, and no sportsman would purchase one of these weapons for any lawful purpose."

11. The term "firearm" is defined to include both "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of any explosive; [and] ... the frame or receiver of any such weapon...." 18 U.S.C. § 921(a)(3).

United States or any possession thereof if the person importing or bringing in the firearm or ammunition establishes to the satisfaction of the Secretary that the firearm or ammunition—

(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10; [12]

(2) is an unserviceable firearm, other than a machinegun as defined in section 5845(b) of the Internal Revenue Code of 1954 [13] (not readily restorable to firing condition), imported or brought in as a curio or museum piece;

(3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms; or

(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm or ammunition.

The Secretary may permit the conditional importation or bringing in of a firearm or ammunition for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm or ammunition will be allowed under this subsection."

---

**12.** 10 U.S.C. § 4301 *et seq.,* which concerns, *inter alia,* firearm training for military personnel.

**13.** 26 U.S.C. § 5845 is the definitional section of the National Firearms Act, 26 U.S.C. § 5801 *et seq.,* which regulates the importation, transfer and taxation of automatic and semi-automatic weapons and weapon parts. Subsection (b), referred to in 18 U.S.C. § 925(d)(2), defines "machinegun" to include any automatic or semi-automatic weapon or any of its parts. Subsection (a), referred to in 18 U.S.C. § 925(d)(3), defines "firearm" as a broad category of small or modified shotguns and rifles, machineguns, mufflers, silencers, and "destructive devices."

Pursuant to the above-quoted provision, the Secretary of the Treasury has promulgated regulations concerning the importation of firearms, collected at 27 C.F.R. part 178. Section 178.112 provides that:

"(a) No firearm or ammunition shall be imported or brought into the United States by a licensed importer (as defined in § 178.11) unless the Director [of the Bureau of Alcohol, Tobacco and Firearms] has authorized the importation of the firearm or ammunition, or the firearm or ammunition is listed on the Importation List compiled by the Director as provided by paragraph (c) of this section.

\* \* \* \* \* \*

"(c) The Director may compile an Importation List of firearms and ammunition which he determines to be generally recognized as particularly suitable for or readily adaptable to sporting purposes.... No firearm shall be placed on the Importation List unless it is found that (1) the caliber or gauge of the firearm is suitable for use in a recognized shooting sport, (2) the type of firearm is generally recognized as particularly suitable for or readily adaptable to such use, and (3) the use of the firearm in a recognized shooting sport will not endanger the person using it due to deterioration through such use or because of inferior workmanship, materials or design."

The Bureau of Alcohol, Tobacco and Firearms has drawn up what it terms a "Partial List," revised periodically, of handguns not authorized for importation, and a separate "Partial List" of those handguns which meet the criteria for importation with an approved permit. The criteria the Bureau applies in classifying handguns for importation are set forth in its "Factoring Criteria For Weapons," BATF Form 4590. There are two prerequisites that an imported handgun must meet before the factoring criteria are applied: It must have a positive manually operated safety device, and a combined height and length of not less than 10 inches. Factoring criteria include the handgun's overall size, weight, frame construction, caliber, safety features and sporting modifications. The Bureau also reserves the

right to refuse the importation of any handgun which meets the factoring criteria but, nevertheless, otherwise fails to satisfy the "sporting purposes" test of § 925(d)(3).

The ban on the importation of any firearm, except those used for law enforcement, military or sporting purposes, indicates Congressional belief that there is a category of firearms which has little or no legitimate purpose. This is reflected in Congressional reports, hearings and floor debates. For example, the Preamble to the Act, as originally enacted, stated (§ 901(a)(7) of P.L. 90–351, 82 Stat. 225, 226):

> "(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems[.]" [14]

Another indication of Congressional policy to single out Saturday Night Specials as having little legitimate purpose

---

14. In S.Rep. No. 1097, 90th Cong., 2d sess. at p. 109, U.S.Code Cong. & Admin.News 1968, at p. 2199, it is stated, regarding this preamble, that:

> "[p]aragraph (7) is a specific finding and declaration that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years have contributed greatly to lawlessness and to the Nation's law enforcement problems.
>
> "This finding and declaration is fully supported by the evidence developed by the investigations of the committee and by testimony before it by the Attorney General of the United States, the attorneys general of California, New Jersey, and South Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New York City, Philadelphia, St. Louis, and the District of Columbia."

The preamble, however, was deleted as a whole from the Act when reenacted by P.L. 90–618, 82 Stat. 1213, because Congress felt it was "unnecessary." H.R.Rep. No. 1577, 90th Cong., 2d sess. at p. 5, U.S.Code Cong. & Admin.News 1968, pp. 4410.

in today's society, and to restrict the public's access to such weapons, is found in S.Rep. No. 1097, 90th Cong., 2d sess. at p. 76–80, U.S.Code Cong. & Admin.News 1968, at pp. 2164–2167:

"The problem of firearms misuse in crimes of violence in the United States has been adequately documented by the Judiciary Subcommittee to Investigate Juvenile Delinquency, commencing with the subcommittee's hearings record of 1963 and including the hearing records of 1964, 1965, and 1967.

"There is no further need to detail the committee's findings in this report, in view of the fact that they are included in the above-referenced hearing records and in Judiciary Committee Report 1866, 89th Congress, second session.

"However, a summary of the major problem areas documented by the committee is appropriate to outline the extent and the scope of the firearms abuse problem.

\* \* \* \* \* \*

"Substantial numbers of firearms that are sold via the mail-order route in the United States are foreign imported firearms, either of the military surplus category or the category of inexpensive, small-caliber firearms, which have been termed as 'unsafe' and as 'Saturday night specials.'

"Our law enforcement officials have testified that from 50 to 80 percent of the crime guns that are confiscated each year are foreign imports of either of the above categories of weapons. Many of these imports are shipped into the United States as parts or disassembled. Many are rebored and rechambered upon reentry into the United States and the barrels are cut down for concealment purposes.

\* \* \* \* \* \*

"The title would curb the flow of surplus military weapons and other firearms being brought into the

United States which are not particularly suitable for target shooting or hunting.

"The provisions concerning the importation of fire-arms would not interfere with the bringing in of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting and for recreational purposes, or for personal protection.

"The importation of certain foreign-made and military surplus non-sporting firearms has an important bearing on the problem which this title is designed to alleviate. Thus the import provisions of this title seem entirely justified."

Additionally, during the hearings on the Act, a substantial amount of the testimony and evidence revolved around the Saturday Night Special and its role in the country's crime problem. This testimony was later summarized during the floor debates of a proposed amendment to the Act (118 Cong.Rec. 21, 27030 (1972) (statement of Sen. Bayh, Subcommittee Chairman)):

"In the course of these hearings, special attention was focused on Saturday night specials because these handguns present a particular problem for law enforcement and public safety by reason of their cheapness, low quality, ease of concealment, and ready availability. Having no legitimate sporting purpose, these weapons, also known as 'bellyguns' and 'manstoppers,' are the predominant firearm used in crime. The term[s], 'bellygun' and 'manstoppers,' are vividly descriptive of the real purpose of these weapons. The committee soon learned that the United States was being flooded with these criminal weapons, and that most of them were coming from foreign sources."

After Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 was passed, but before its effective date, Congress reenacted the title as the Gun Control Act of

1968.[15] The importation ban on handguns was not affected. In fact, H.R.Rep. No. 1577, 90th Cong., 2d sess., stated at p. 9, U.S.Code Cong. & Admin.News 1968, at p. 4415:

"It has also been urged that the import restrictions of existing law, which are continued in the bill, should be relaxed. The [House Judiciary] committee does not agree. The main purpose of the import restrictions is to arrest the present flood of imports of surplus military weapons and low-priced foreign-made firearms generally, since these types of import[ed] weapons have caused major law enforcement problems."

For further evidence that the Gun Control Act of 1968 was designed to ban the importation of Saturday Night Specials because they comprise a distinct category of guns with little or no legitimate value, *see, e.g.,* Hearings on S. 2507 Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 92nd Cong., 1st sess.; and 118 Cong.Rec. 21, 27033 (1972) (statement of Sen. Bayh, Chairman of Subcommittee).

(2)

The Maryland gun control legislation, discussed earlier, reflects a similar policy. It permits legitimate uses of handguns akin to those allowed under the federal legislation. Besides recognizing the federally permitted use of handguns for law enforcement purposes, Code, Art. 27, § 36B(c)(1), and sporting purposes, Code, Art. 27, § 36B(c)(3), the Maryland statute also indicates that protection at one's place of business or real estate owned or leased by him, and the carrying of handguns by one having a permit, are legitimate handgun uses. § 36B(c)(2), (4) and § 36E(a). In addition to the specific regulations concerning handguns, the General Assembly also has established separate statutory prohibitions concerning the sale or transfer

---

**15.** The reenactment strengthened the gun control provisions by applying the restrictions to shotguns and rifles, and by controlling the interstate shipment and sale of ammunition. The provisions regarding the importation of handguns remained the same.

of pistols and revolvers. Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.), Art. 27, §§ 441–448. These sections, like §§ 36B–36G, show that only the legitimate use of handguns is consistent with State policy.

Saturday Night Specials are largely unfit for any of the recognized legitimate uses sanctioned by the Maryland gun control legislation. They are too inaccurate, unreliable and poorly made for use by law enforcement personnel, sportsmen, homeowners or businessmen. *See supra* notes 9 and 10. The chief "value" a Saturday Night Special handgun has is in criminal activity, because of its easy concealability and low price. Obviously, the use of a handgun in the commission of a crime is not a "legitimate" use justified by State policy. To the contrary, the Legislature has expressly declared that the criminal use of a handgun is a separate crime that carries a mandatory sentence of not less than five years imprisonment. § 36B(d).[16] Furthermore, the General Assembly has specifically banned the sale of pistols and revolvers to, *inter alia*, persons who have been convicted of a crime of violence. Code, Art. 27, § 445.[17]

---

**16.** Code, Art. 27, § 36B provides, in pertinent part:

"(d) *Unlawful use of handgun or antique firearm in commission of crime; penalties.*—Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor:

(1) For a first offense, be sentenced to the Maryland Division of Correction for a term of not less than 5 nor more than 20 years, and it is mandatory upon the court to impose no less than the minimum sentence of 5 years.

(2) For a second or subsequent offense, be sentenced to the Maryland Division of Correction for a term of not less than 5 nor more than 20 years, and it is mandatory upon the court to impose no less than a minimum consecutive sentence of 5 years which shall be served consecutively and not concurrently to any other sentence imposed by virtue of the commission of said felony or misdemeanor."

**17.** § 445 states that:

"(d) *Sale or transfer to criminal, fugitive, etc.*—A dealer or person may not sell or transfer a pistol or revolver to a person whom he

Thus, the policy implications of the gun control laws enacted by both the United States Congress and the Maryland General Assembly reflect a governmental view that there is a handgun species, *i.e.*, the so-called Saturday Night Special, which is considered to have little or no legitimate purpose in today's society.

(3)

Moreover, the manufacturer or marketer of a Saturday Night Special knows or ought to know that he is making or selling a product principally to be used in criminal activity. For example, a salesman for R.G. Industries, describing what he termed to be a "special attribute" of a Rohm handgun, was said to have told a putative handgun marketer, " 'If your store is anywhere near a ghetto area, these ought to sell real well. This is most assuredly a ghetto gun.' " The R.G. salesman allegedly went on to say about another R.G. handgun, " 'This sells real well, but, between you and me, it's such a piece of crap I'd be afraid to fire the thing.' " Brill, *The Traffic (Legal and Illegal) In Guns*, Harper's, Sept. 1977, at 40.[18]

One commentator, in advocating the imposition of liability upon the manufacturers of Saturday Night Specials, stated:

> "It has been suggested that Saturday Night Specials pose a great risk of criminal misuse particularly because they are easily concealable and relatively inexpensive. Most Saturday Night Specials are, in fact, used in crime. In addition, any countervailing social usefulness is negligible because the poor quality of their manufacture precludes

---

knows or has reasonable cause to believe has been convicted of a crime of violence...."
*See also* § 442(c)(2)(i), requiring every prospective purchaser to sign a statement that he has never been convicted of a crime of violence.

**18.** It is noteworthy that when the Senate Committee on the Judiciary held its subcommittee hearings on Saturday Night Specials, it asked some of the leading manufacturers of such guns to testify, and all refused. *Handgun Control Hearings, supra*, note 8, at 293–300.

their use for most legitimate purposes. Other guns are safer and more accurate for legitimate uses, while not posing the same danger of criminal misuse."

Iveson, *Manufacturers' Liability to Victims of Handgun Crime: A Common Law Approach,* 51 Fordham L.Rev. 771, 791–792 (1983).

We are not aware of any case in other jurisdictions which either distinguishes Saturday Night Specials from handguns in general when deciding a liability claim against a gun manufacturer or marketer for gunshot injuries caused by the criminal use of the product, or which expressly refuses to make such distinction. An analogy may be drawn, however, to the decision of the Supreme Court of Michigan in *Moning v. Alfano,* 400 Mich. 425, 254 N.W.2d 759 (1977). In *Moning,* an eleven year old child was seriously injured by a projectile fired from a slingshot by a playmate. The court reversed a directed verdict for the slingshot's manufacturer, concluding that the manufacturer could be held liable for marketing the slingshot directly to children because a child's misuse was foreseeable. The court reasoned that marketing a dangerous product, knowing that it would be chiefly used by a class of purchasers likely to misuse the product, could be considered unreasonable. 400 Mich. at 446–449, 254 N.W.2d 759.[19]

Similarly, the manufacturer or marketer of a Saturday Night Special knows or ought to know that the chief use of the product is for criminal activity. Such criminal use, and the virtual absence of legitimate uses for the product, are clearly foreseeable by the manufacturers and sellers of Saturday Night Specials. *Cf. Volkswagen of America v. Young,* 272 Md. 201, 216–217, 321 A.2d 737 (1974).

---

**19.** *Cf. Bojorquez v. House of Toys, Inc.,* 62 Cal.App.3d 930, 133 Cal. Rptr. 483 (1976), in which the California Court of Appeals, in a similar situation, declined to impose liability because, *inter alia,* it would result in a ban on the sale of the toys by judicial fiat. The *Bojorquez* court also refused to hold the defendants strictly liable for failure to warn, because they viewed the inherent dangers of a slingshot to be a matter of common knowledge.

Moreover, as between the manufacturer or marketer of a Saturday Night Special, who places among the public a product that will be used chiefly in criminal activity, and the innocent victim of such misuse, the former is certainly more at fault than the latter. *Cf. Phipps v. General Motors Corp., supra,* 278 Md. at 352–353, 363 A.2d 955.

■ For the above reasons, we conclude that it is entirely consistent with public policy to hold the manufacturers and marketers of Saturday Night Special handguns strictly liable to innocent persons who suffer gunshot injuries from the criminal use of their products. Furthermore, in light of the ever growing number of deaths and injuries due to such handguns being used in criminal activity, the imposition of such liability is warranted by today's circumstances.

While the fact that a handgun is a Saturday Night Special may not bring its manufacturer or marketer within any of the previously existing theories of strict liability discussed in part II of this opinion, we have repeatedly pointed out that the common law adapts to fit the needs of society. Consequently, we shall recognize a separate, limited area of strict liability for the manufacturers, as well as all in the marketing chain, of Saturday Night Specials.

## B.

■ There is no clear-cut, established definition of a Saturday Night Special, although there are various characteristics which are considered in placing a handgun into that category. Relevant factors include the gun's barrel length, concealability, cost, quality of materials, quality of manufacture, accuracy, reliability, whether it has been banned from import by the Bureau of Alcohol, Tobacco and Firearms, and other related characteristics. Additionally, the industry standards, and the understanding among law enforcement personnel, legislators and the public, at the time the weapon was manufactured and/or marketed by a particular defendant, must be considered. Because many of these factors are relative, in a tort suit a handgun should

rarely, if ever, be deemed a Saturday Night Special as a matter of law. Instead, it is a finding to be made by the trier of facts.

On the other hand, before the question of liability may go to the trier of facts, a threshold question must be decided as a matter of law. Since both state and federal statutes reflect a policy that there are legitimate uses for handguns, the trial court must first find that the plaintiff has made a showing that the handgun in question possesses sufficient characteristics of a Saturday Night Special. Moreover, merely because a handgun is small and short barrelled is not itself sufficient for the issue to be submitted to the trier of facts. As stated earlier, the General Assembly of Maryland has recognized the need for certain persons to carry guns, for example, law enforcement personnel and persons with special permits. Non-uniformed law enforcement personnel and certain permit holders will of necessity be required to carry small, short barrelled handguns. A high-quality, small, short barrelled handgun, designed for such legitimate use, is not a Saturday Night Special, and the trier of facts should not be permitted to speculate otherwise. While the determination by the trial court that the plaintiff has passed the initial hurdle cannot be based on size and barrel length alone, these factors, coupled with evidence of low cost, poor quality of materials or workmanship, unreliability, or other identifying characteristics, may be sufficient for the trial court to allow the issue to go to the trier of facts.

Finally, once the trier of facts determines that a handgun is a Saturday Night Special, then liability may be imposed against a manufacturer or anyone else in the marketing chain, including the retailer. Liability may only be imposed, however, when the plaintiff or plaintiff's decedent suffers injury or death because he is shot with the Saturday Night Special. In addition, the shooting must be a criminal act. The shooting itself may be the sole criminal act, or it may occur in the course of another crime where

the person firing the Saturday Night Special is one of the perpetrators of the crime. Although neither contributory negligence nor assumption of the risk will be recognized as defenses, nevertheless the plaintiff must not be a participant in the criminal activity.[20] If the foregoing elements are satisfied, then the defendant shall be liable for all resulting damages suffered by the gunshot victim, consistent with the established law concerning tort damages.

## IV.

We shall now turn to the question of whether the Rohm Revolver Handgun, Model RG–38S, serial number 0152662, falls within the category of a Saturday Night Special. Under the principles set forth above, this issue does not present a question of law under the Uniform Certification of Questions of Law Act; instead it is a matter for the United States District Court. We shall, however, offer a few comments on this question for whatever assistance they may provide.

There is little information about the weapon set forth in the plaintiffs' declaration which would indicate whether it allegedly falls within the category of a Saturday Night Special. This is understandable, however, as we had drawn no distinction between handguns generally and Saturday Night Specials when the declaration was filed. On the other hand, there is an abundance of material available elsewhere. For example, R.G. Industries, Rohm's American subsidiary, has been called the nation's major producer of Saturday Night Specials.[21] It was included on a list of domestic manufacturers and marketers of handguns that do

---

**20.** The potential class of plaintiffs could include the intended victims of the crime, innocent persons who are unintentionally shot by the criminal, and law enforcement personnel or others who intervene to prevent the crime, to assist the victims, or to apprehend the perpetrator of the crime.

**21.** Brill, *The Traffic (Legal and Illegal) In Guns,* Harper's, Sept. 1977, at 39.

not meet the federal standards for importation sent by the Department of the Treasury to the Senate subcommittee investigating Saturday Night Specials.[22]  During the Senate hearings, some Rohms were described as "junk guns,"[23] as having no "legitimate sporting purpose,"[24] and as guns that should not be "sold in the American market under any circumstances."[25]  Further, the *Project Identification* study conducted by the Bureau of Alcohol, Tobacco and Firearms, *supra* note 9, classified seized handguns in three categories, the third category, Class III, being of the poorest quality and least expensive.  That study stated that "all Rohms ... were considered to be Class III."  *Id.* at 9.

Additional information shows a recent suggested list price of an RG–38S as $35.00, if in good condition, or $55.00, if in excellent condition.[26]  No Rohm handgun in a two inch barrel may be imported into the United States.[27]  A Rohm RG–38 double action revolver, .38 special caliber with a three inch barrel, also cannot be imported into the United States,[28] but a Model RG–38 Revolver (37 ounce weight) .38

---

**22.** *Handgun Control Hearings, supra* note 9 at 165.

**23.** Statement of Lt. Ralph Joyce, Commanding Officer of the Homicide Bureau, Cleveland Police Department.  *Handgun Control Hearings* at 309.  Lt. Joyce also said of a Rohm that it was "one word everyone in the homicide department knows how to spell believe me." *Id.* at 293.

**24.** Statement of Maxwell Rich, Executive Vice President, National Rifle Association.  *Handgun Control Hearings* at 321.

**25.** Statement of Harold Serr, retired Director of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service.  *Handgun Control Hearings* at 332.

**26.** D. Byron, *The Official 1982 Price Guide to Antique and Modern Firearms* (2d Ed.1982) at 359.

**27.** Bureau of Alcohol, Tobacco and Firearms Form 4690 (7570.5).  *See also* notes 28, 30, *infra.*

**28.** "Partial List of Foreign Produced Handguns Not Authorized for Importation Into the United States," publication of the Bureau of Alcohol, Tobacco and Firearms, Department of Treasury, at 9.

special caliber, with three and six inch barrels, modified with target accessories and a serial number over 250,000,[29] may be imported, as may some other long-barrelled, target modified .38 specials.[30]

If this case were here on appeal and writ of certiorari from a Maryland circuit court, we would remand the case for further proceedings in light of the principles of Maryland law adopted in this opinion.

## V.

One final matter warrants discussion, namely the effective date of the modification in Maryland common law tort principles which is set forth in Part III of this opinion.

Ordinarily in a case such as this, which changes common law principles applicable to civil actions sounding in tort, we would apply the change to the case before us and prospectively to all such causes of action accruing after the date of the case before us. *Boblitz v. Boblitz*, 296 Md. 242, 275, 462 A.2d 506, 622 (1983). The cause of action recognized in Part III of this opinion would normally accrue when the plaintiff suffered a gunshot injury from a Saturday Night Special in the course of criminal activity.

There may, however, be an element of unfairness in applying the common law change herein recognized to all causes of action accruing after this case. The gist of the wrongful act on the part of the manufacturers and marketers of Saturday Night Specials, underlying the cause of action, is the marketing of such guns to the public, knowing that they have little or no legitimate use and foreseeing that the product's chief use is for criminal activity. While

---

**29.** As noted earlier, the serial number of the handgun in the present case is 0152662.

**30.** Such guns are commonly known as an RG–38–6, RG–38–Target, RG–38–3 or RG–38–4. "Partial List of Foreign Handguns Which Meet the Criteria for Importation Into the United States With an Approved Permit," publication of the Bureau of Alcohol, Tobacco and Firearms, Department of Treasury, at 22–23.

manufacturers and marketers of handguns have or should have had such knowledge for a long time, nevertheless until now they have had little reason to anticipate that their actions might result in tort liability. As previously pointed out, no case to the best of our knowledge has heretofore dealt with the particular form of liability recognized in Part III of this opinion. Consequently, when a Saturday Night Special has been first marketed to a member of the public prior to the date of our mandate in this case, but the cause of action accrues after the date of the mandate, there may be some basis for the defendant manufacturers and marketers to complain of unfairness.

█ Therefore, the change in the common law set forth in Part III of this opinion will apply in the instant case. It will also apply to all other causes of action accruing after the date of our mandate in this case unless it is shown that the initial marketing of the Saturday Night Special to a member of the public, which will usually be the first sale of the gun by a retail gun dealer to a customer, occurred prior to the date of the mandate. In such event, the basis for liability recognized in Part III will not apply, even though the gunshot injury took place after our mandate.[31]

QUESTIONS OF LAW ANSWERED AS HEREIN SET FORTH. EACH PARTY TO PAY ITS OWN COSTS.

---

**31.** Our holding in this regard does place upon the defendant manufacturers and marketers the burden of production and persuasion to show that the retail sale took place prior to the date of our mandate. We believe this to be appropriate, as the facts concerning the date of sale to a member of the public can be ascertained much more easily by the defendants than the plaintiff.